**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| **RANDI BLACK** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **CE SOIR LINGERIE CO., INC,** | § | |
| **BRAGEL INTERNATIONAL, INC.,** | § | **CIVIL ACTION NO. 2:06-CV-544** |
| **DILLARD'S, INC., FEDERATED** | § | |
| **DEPARTMENT STORES, INC.,** | § | |
| **GAP, INC., THE NEIMAN MARCUS** | § | |
| **GROUP, INC., NORDSTROM, INC., and** | § | |
| **VICTORIA'S SECRET STORES, LLC** | § | |

## MEMORANDUM OPINION & ORDER

The Court now issues this claim construction opinion construing the terms in U.S. Patent No. 7,152,606 (hereinafter "the '606 patent"). Plaintiff Randi Black asserts that Defendants Ce Soir Lingerie Co., Inc.; Bragel International, Inc.; Dillard's, Inc.; Federated Department Stores, Inc.; Gap, Inc.; The Neiman Marcus Group, Inc.; Nordstrom, Inc.; and Victoria's Secret Stores, LLC have infringed and continue to infringe Claims 1-5 of the '606 patent.

### THE '606 PATENT

The '606 patent deals with a method of wearing a nipple cover. The method was developed in an attempt to avoid the visibility of erect nipples when women wear sheer clothing without a brassiere.

### APPLICABLE LAW

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). In claim construction, courts examine the patent's intrinsic

evidence to define the patented invention's scope. *See id.*; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Communications Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001).  This intrinsic evidence includes the claims themselves, the specification, and the prosecution history.  *See Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861.  Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent.  *Phillips*, 415 F.3d at 1312-13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The Court begins, as it must, with the words of the claim.  *See Teleflex*, 299 F.3d at 1324; *see also CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) ("The terms used in the claims bear a presumption that they mean what they say and have the ordinary meaning that would be attributed to those words by persons skilled in the relevant art.").  The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314.  First, a term's context in the asserted claim can be very instructive.  *Id*. Other asserted or unasserted claims can also aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent.  *Id*.  Differences among the claim terms can also assist in understanding a term's meaning.  *Id*.  For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation.  *Id*. at 1314-15.

Claims "must be read in view of the specification, of which they are a part."  *Id*. (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978 (Fed. Cir. 1995)).  "[T]he specification 'is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'"  *Id*. (quoting *Vitronics Corp. v. Conceptronic, Inc.*,

2

90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).  This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316.  In these situations, the inventor's lexicography governs.  *Id*.  Also, the specification may resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone."  *Teleflex, Inc.*, 299 F.3d at 1325.  But, "although the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims."  *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998); *see also Phillips*, 415 F.3d at 1323.  The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent.  *Home Diagnostics, Inc., v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent.").

Although extrinsic evidence can be useful, it is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'"  *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862).  Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent.  *Id*. at 1318.  Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition is

entirely unhelpful to a court.  *Id*.  Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms."  *Id*.

Finally, it is important to remember that although the specification often describes very specific embodiments of the invention, the Federal Circuit has cautioned against confining the claims to those embodiments.  *See Phillips*, 415 F.3d at 1323.  The roles of the specification are to "teach and enable those of skill in the art how to make and use the invention and to provide a best mode for doing so.  One of the best ways to teach a person of ordinary skill how to make and use the invention is to provide an example of how to practice the invention in a particular case."  *Id*.  "'[T]he claims of the patent, not its specifications, measure the invention.'"  *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004) (citation omitted).  "Accordingly, particular embodiments appearing in the written description will not be used to limit claim language that has broader effect.  And, even where a patent describes only a single embodiment, claims will not be interpreted 'restrictively unless the patentee has demonstrated a clear intention to limit the claim scope 'using words or expressions of manifest exclusion or restriction.'"  *Id*. at 1117 (citations omitted).

### TERMS TO BE CONSTRUED

The terms at issue are: "at least about one half and less than all" (found in Claim 1), "the cover" (found in Claims 1, 4, and 5), "proximate" (found in Claim 1), "brassiere" (found in Claim 3), "affixed" (found in Claim 4), "nipple cover" (found in Claims 1-3, 5), "center" (found in Claim 1), "conforming to a human breast" (found in Claim 1), "second thickness" (found in Claim 1), "periphery" (found in Claim 1), "gradually tapering" (found in Claim 1), and "blends smoothly" (found in Claim 1).

*Agreed Terms*

Prior to the *Markman* hearing, the parties agreed on the construction of the following terms: "at least about one half and less than all," "the cover," "proximate," "brassiere," and "affixed." The parties agreed that the term "at least about one half and less than all" means "greater than about half of and less than all of the surface area of a breast." For the term "the cover," the parties agreed that the term means "the nipple cover." The parties agreed that the term "proximate" means "very near." The parties also agreed that the term "brassiere" means "a woman's undergarment for supporting the breasts." Finally, for the term "affixed," the parties agreed that the term means "fastened, secured, or physically attached."

At the *Markman* hearing held on September 20, 2007, the parties also agreed on the construction of the following terms: "conforming to a human breast," "second thickness," and "periphery." Per the parties agreements, "conforming to a human breast" needs no construction. *See* Transcript of *Markman* Hearing at 52, *Black v. Ce Soir Lingerie Co., Inc.*, Civ. No. 2:06-cv-544 (E.D. Tex. 2007). The parties agreed that the term "second thickness" means "a thickness very near an outer boundary, which is thinner than a thickness very near the center." *See* Transcript of *Markman* Hearing at 57. Finally, the parties agreed that the term "periphery" means "the outer boundary."[1] *See* Transcript of *Markman* Hearing at 61.

The Court adopts all of the parties' agreed constructions above as the constructions of the Court.

---

[1]

Though the parties agreed at the *Markman* hearing to the construction "the external boundary" for the term "periphery," in the interest of consistency the Court will adopt "outer" instead of "external." There appears to be no significant difference between the two terms, and the parties agreed in other terms to use "outer" instead of "external" to describe the boundary of the nipple cover.

*1.      "Nipple Cover"*

For the term "nipple cover," Plaintiff proposes "an article for covering the nipple on a human breast, that is not supported by attached straps around the body or by a brassiere, that is smaller than a brassiere, and that does not substantially enhance the apparent size of a woman's breast."[2] Defendants offers: "a small, thin, flexible, flesh-colored device that covers the nipple and extends a short distance beyond the nipple and areola and that is not intended to replace or enhance a woman's breast and is not intended to provide support to the breast."[3]

The parties' proposed constructions contain essentially three key disputed elements: (1) the size of the cover, (2) whether the nipple cover is supported by straps or provides support, and (3) the enhancement element.  After comparing the parties' proposals and considering all relevant evidence, the Court adopts the following construction for the term "nipple cover": "an article for covering the nipple that extends beyond the nipple and areola; is unsupported by attached straps around the neck, back, shoulders, or arms; and does not replace or substantially enhance the apparent size of a woman's breast."

Turning first to the size aspect of the nipple cover, both parties agree the concept of size is part of the ordinary meaning of "nipple cover."  Plaintiff argues that a nipple cover must only be "smaller than a brassiere."  Defendants argue that the nipple cover must, at a minimum, "cover the

_____

[2]

In both the initial joint claim construction charts provided to the court and the parties' claim construction briefs, Plaintiff initially included "an article for *concealing* the nipple..." for her proposed construction of nipple cover.  Though the parties briefed the issue as if it were a point of contention, the most recent joint construction chart provided to the Court included for Plaintiff's proposal "an article for *covering* the nipple..." instead.  By using "covering" in the most recent joint construction, Plaintiff and Defendant apparently no longer have a dispute on this issue.

[3]

Defendants later agreed to drop the "thin, flexible, flesh-colored" language from their proposed construction. *See* Transcript of *Markman* Hearing at 5.

6

nipple and extend a short distance beyond the nipple and areola."

The specification provides useful guidance for defining the nipple cover's minimum size. While the specification states that the illustrations in the figures are not intended to provide a specific size limitation, it also states that "the nipple cover is of sufficient size such that it can cover a user's entire nipple and areola." *Compare* '606 patent col. 2 ll. 60-64, *with* '606 patent col. 2 ll. 50-51. Indeed, the patent's purpose centers around the nipple cover's ability to cover the entire nipple shape–any less coverage, and the purpose would be frustrated. *See, e.g.,* '606 patent col. 1 ll. 42-44; '606 patent col. 2 ll. 27-30; '606 patent col. 2 ll. 50-51. Between the overt statement in the specification and the overall purpose of the patent, there is strong evidence that the nipple cover must cover, at a minimum, the user's entire nipple and areola. The parties' proposed constructions seek, however, to either go beyond this basic defining characteristic or take an entirely different approach to specifying the size aspect of the cover.

Instead of defining the coverage area, Plaintiff takes the different approach of defining the nipple cover's size through a maximum size concept by arguing that the cover must only be "smaller than a brassiere." Plaintiff's proposal finds support in the specification, as it specifically states that the nipple cover is smaller than a brassiere. *See* '606 patent col. 1 ll. 46-47 ("The nipple cover is also an improvement over the use of a brassiere because it is smaller in size and bulk..."). However, solely using the language "smaller than a brassiere" would be confusing since the patent provides no pertinent comparison to define the 'smaller' size. Does 'smaller' mean the nipple cover is smaller than a particular brassiere cup size, or does it mean smaller overall when brassieres straps and belts are also included in addition to the cup portion of the bra? Given these uncertainties, particularly when taken in conjunction with the varying sizes, styles, and structures of brassieres, the phrase

"smaller than a brassiere" provides little helpful guidance in defining the term "nipple cover."[4]

Defendants argue that not only does the specification disclose the nipple cover's size is sufficient to cover the entire nipple and areola, but that it should also extend a "short distance" beyond the nipple and areola.  In support of their assertion, Defendants first point to the preferred embodiment in the specification.  In the preferred embodiment, the specification outlines that "the nipple cover will extend approximately one-eighth to one-fourth of an inch beyond the areola." '606 patent col. 2 ll. 53-55.  However, the specification on the whole qualifies the precise distances listed in the preferred embodiment by noting that "the exact size of the nipple cover . . . will vary." '606 patent col. 2 ll. 55-56.  More importantly, the Federal Circuit has repeatedly cautioned against limiting the claims to the preferred embodiment.  *See Phillips v. AWC Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (en banc).  Defining the term using the precise distances described in the preferred embodiment would be importing limitations into the claim, as the claimed invention seemingly allows for nipple covers of greater or lesser coverage than those described in the preferred embodiment.  Using the preferred embodiment as the sole guidepost to require that the nipple cover must extend a "short distance" beyond the nipple and areola is therefore inappropriate.

In addition to the preferred embodiment, Defendants also point to other areas of the specification which state the nipple cover should extend a "short distance" beyond the nipple and areola.  *See* '606 patent col. 2 ll. 51-53 ("The cover will also extend a short distance beyond this area to ensure complete coverage").  Between the preferred embodiment and other portions of the

---

4

   Other parts of the Court's final construction incorporate the idea that the nipple cover is generally smaller in bulk and size than an average brassiere without having to specifically include that language in the construction.  Both the sizes provided in the claims and the inclusion of language in the construction reflecting the lack of straps incorporate the idea that the nipple cover is conceptually lesser in bulk and size than a brassiere.

specification, it is clear the specification discloses that the cover should extend some distance beyond the nipple and areola.  However, using the phrase a "short distance" in the nipple cover's definition presents the same problems as using "smaller than a brassiere," and is ultimately problematic for other reasons as well.  Similar to the problem with using "smaller than a brassiere" to define the nipple cover's size, interpreting what qualifies as a  "short distance" is ambiguous and difficult to assess.  Also, the claims do not limit the invention to extending only a "short distance" beyond the nipple and areola.  What is clear from the specification is that the patent's method utilizes a nipple cover to ensure complete coverage of the nipple and areola, and also to blend smoothly with the surface of the breast for aesthetic purposes.  By stating that the nipple cover "extends beyond" the nipple and areola, the Court's construction effectively conveys this central purpose, and is also consistent with the claim language without limiting the claims (which require coverage of roughly one half of the breast at a minimum).  *See* '606 patent col. 4 ll. 16-18.  For the size aspect, the Court therefore adopts the phrase "extends beyond the nipple and areola" as part of the Court's construction.

Turning next to the question of support, Plaintiff offers as part of her construction the language that the nipple cover "is not supported by attached straps around the body or by a brassiere," while Defendants' construction incorporates the language "is not intended to provide support to the breast."  Each party takes a different approach to the support element of the nipple cover.  Plaintiff's construction focuses on how the nipple cover itself is not supported, while Defendant's proposal instead focuses on how the nipple cover does not support the breast.

Other than reference to use of an adhesive to attach the nipple cover in dependent Claim 4, the claims do not directly discuss this question of support to the nipple cover and breasts.  In the

9

specification, however, it is clear that the inventor was trying to distinguish the nipple cover from a brassiere through a lack of supporting straps: "[t]he nipple cover is also an improvement over the use of a brassiere because . . . it also lacks the use of straps and belts which can cause discomfort." '606 patent col. 1 ll. 46-49.   Indeed, a large part of the purpose of the patent was to avoid the discomfort of belts and straps pressing against the body.  *See* '606 patent col. 1 ll. 30-33.  Using this intrinsic evidence as a guide, the portion of Plaintiff's proposed construction stating that the nipple cover is "unsupported by attached straps" appears correct.[5]  The parties' chief disagreement centers on Plaintiff's inclusion of the "around the body" language, and the Court agrees with Defendant that the language in Plaintiff's proposal that it lacks straps "around the body" is over-inclusive and vague. The key concept is that the nipple cover lacks straps supporting the cover itself, and also lacks straps to avoid visibility or pressure against the body.  Straps around the neck, back, shoulders or arms attached to the nipple cover would provide support to both the nipple cover and the breast, and would likely be visible under sheer clothing and press against the body.  The Court therefore adopts the phrase that the nipple cover "is unsupported by attached straps around the neck, back, shoulders, or arms" as part of the Court's final construction.[6]  There is little support for any construction more specific or inclusive than the Court's construction.

Instead of discussing straps and belts in their construction, Defendants' cite the specification

---

[5]

The parties' actually agree that the nipple cover lacks straps.  *See* Transcript of *Markman* Hearing at 9-10.  The President of Ce Soir Lingerie, one of the defendants, also noted in her deposition that a nipple cover does not have straps. *See* Pl.'s Claim Constr. Br. 6, Exh. 8, Ann Deal Deposition, 6/1/2007, 128:25-129:10.

[6]

At the *Markman* hearing, there was much discussion about whether two nipple covers could have a strap between them.  *See* Transcript of *Markman* Hearing at 5-10.  Whether or not the claimed invention would allow for a strap between two nipple covers is unclear, since it is questionable whether such a strap would support the cover, cause discomfort, or be visible.  What is clear from the specification is that the  device is unsupported by straps which would be visible or press against the body.

to argue only that the nipple cover is "not intended to provide support to the breast." *See* '606 patent col. 2 ll. 29-30.  By saying the nipple cover lacks straps around the neck, back, shoulder or arms, the Court's construction largely incorporates Defendants' proposal.[7]  If the nipple cover has no straps around the arms, shoulder, or back to support the cover, any incidental supporting effect the nipple cover provides is merely an unintended side effect of the other functions of the cover.  Further, inserting an intent element in the construction could result in unnecessary confusion.[8]  Again, the key concept in the specification is that the nipple cover lacks visible straps or belts pressing against the body, and the Court's construction accounts for these considerations.

The final element of the support limitation that bears analysis is Plaintiff's proposed language that the nipple cover is not supported by a brassiere.  Starting with the claim language, the only discussion of the interplay between a nipple cover and brassiere comes in Claim 3, which states: "The method of Claim 2, further comprising a step of wearing clothing in contact with an outer surface of the nipple cover without a brassiere."  '606 patent col. 4 ll. 33-35.  There are a couple noteworthy considerations in Claim 3's language.  First, Claim 3 is a dependent claim–it is dependent upon Claim 2, which is in turn dependent upon Claim 1.  Claim 3 is ultimately adding a limitation to an independent claim (Claim 1, via Claim 2), the limitation being a step of wearing clothing in contact with the surface of the nipple cover without a brassiere.  The Federal Circuit has stated that when a dependent claim adds a limitation to an independent claim, it is presumed that the

---

[7]

At the *Markman* hearing, Defendants agreed "that the patented device is not intended to include straps or belts." Transcript of *Markman* Hearing at 9-10.

[8]

Though the specification states that the cover is not intended to provide support, the nipple cover could arguably contain some minuscule supporting effect through the use of the adhesive to attach the cover.  Determining whether the incidental support from the adhesive or other aspects of the cover were intended could result in unnecessary confusion over a relatively minor point.

11

independent claim does not include the limitation.  *Phillips*, 415 F.3d at 1314-15.  The term "nipple cover" appears in both claims.  Therefore, independent Claim 1 presumably does not contain the "step of wearing clothing in contact with an outer surface of the nipple cover without a brassiere," or Claim 3 would be unnecessary.  Taken independently, Claim 1 therefore would seem to allow for a method of wearing the nipple cover in contact with a brassiere instead of other clothing.

The specification also supports such an assertion.  Indeed, the specification directly discusses situations where a nipple cover can be worn with a brassiere.  *See* '606 patent col. 2 ll. 17-20 ("The present invention consists of a flexible, reusable and flesh-colored apparatus that covers the nipple so that a woman can go braless *or wear a thin bra or lingerie*") (emphasis added).  Though neither the claims nor the specification call for a brassiere to support a nipple cover, it nonetheless appears to be within the scope of the invention.

In support of her argument that a nipple cover is not worn with a brassiere, Plaintiff turns to the prosecution history, other portions of the specification, and prior art patents.  During prosecution, the patentee distinguished certain prior art by pointing out that the claimed invention "is not for putting underneath a bra."  *See* Pl.'s Reply Br. Claim Constr. 2, Exh. 9, Remarks, P5080.  Plaintiff also argues the specification "repeatedly contrasts the invention with devices held on by belts and straps around the body or a brassiere," with lines stating that "[t]he present invention can therefore be used in instances where the use of a brassiere is not practical," and "a woman can go braless." Pl.s Claim Constr. Br. 5 n.1 (citing '606 patent col. 1 ll. 44-45; '606 patent col. 2 l. 19).  Finally, Plaintiff also cites prior art patents discussing nipple covers to support her assertion.  *See* Pl.'s Claim Constr. Br. 6 (citing U.S. Patent No. 4,333,471 col. 1 ll. 19-28).  The Court agrees with Plaintiff that generally it appears a nipple cover is designed to allow the cover to be worn without a brassiere.

12

However, the quotes Plaintiff chose from the specification which "repeatedly contrast the invention" with devices held in place by a brassiere both state only that a nipple cover *can* be used without a brassiere, not that it *must* be worn without one. The second half of one of the quotes Plaintiff provides (that a "woman can go braless") even specifically states that the nipple cover can be worn under a brassiere. *See* '606 patent col. 2 l. 19-20. The specification therefore undermines Plaintiff's arguments. Plaintiff's references to the prior art patent's discussion of the nipple cover eliminating the brassiere, when taken in proper context, also offer no support.[9] When the patent is thoroughly examined, the only support for Plaintiff's assertion is the isolated quote during the prosecution history that the invention is not to be worn under a bra.

Ultimately, Plaintiff has not presented enough convincing evidence limiting the definition of "nipple cover" to being unsupported by a brassiere.[10] The claimed invention does not preclude

---

[9]

In her claim construction brief, Plaintiff points to prior art patents for interpreting the ordinary meaning of nipple cover, and argues that U.S. Patent No. 4,333,471 (hereinafter "the '471 patent") states that the nipple cover is not held in place by a brassiere: "it was 'developed with an aim of eliminating the... brassiere [which] presses upon the breast and body of the user by its belts and straps with a resultant inherent discomfort and inconvenience.'" Pl.'s Claim Constr. Br. 6 (citing '606 patent col. 1 ll. 19-28) (emphasis in original). However, Plaintiff's cropped quote takes the statement in the '471 patent out of its proper context, giving this section of the patent a different meaning than originally stated. Plaintiff's use of the ellipsis in the quote makes it imply that the '471 patent directly stated or implied that the intent of the nipple cover in the '471 patent was specifically to eliminate the brassiere. However, rather than specifically stating the nipple cover was designed to eliminate a brassiere, the '471 specification states the nipple cover was designed to eliminate the *disadvantages* of a brassiere. *See* '471 patent col. 1 ll 27-28 ("The present invention was developed with the aim of eliminating the above disadvantages"). Much as the '606 patent does, the '471 patent discusses the disadvantages of a brassiere as being the visibility of the brassiere through clothing, discomfort of straps and belts pressing upon the body, and excessive perspiration under a brassiere during hot weather. *See* '471 patent col. 1 ll. 16-24. The '471 patent does not, however, specifically discuss eliminating the brassiere itself—only eliminating the disadvantages. Plaintiff's cropped and out-of-context quote is therefore misleading. The Court agrees that the nipple cover is an option to women who wish to wear something other than a brassiere to hide their nipples, however neither the specification of the '471 patent nor the method described in the claims of the present invention specifically disclaim the possibility of a nipple cover and a brassiere being worn together.

[10]

Plaintiff also points out in her reply brief that Defendants do not dispute this aspect of her proposed construction in either their claim construction brief or at the *Markman* hearing. While true, Defendants did not include the 'unsupported by a brassiere' language in their proposal, and the Court has no evidence before it indicating Defendants wished to adopt this portion of Plaintiff's proposal.

13

the nipple cover being worn under a brassiere; in fact, the specification specifically teaches that a nipple cover be utilized under a brassiere, which would ultimately provide support to the nipple cover.  *See* '606 patent col.2 ll. 19-20.  Though Plaintiff did state during prosecution history that the nipple cover is not for wearing under a bra, the method she claimed suggests the opposite, and the claims govern the boundaries of the invention.

The final disputed aspect of the definition of "nipple cover" included in both parties' proposed construction is the enhancement limitation.  To reflect her view on the invention's relation to enhancement of the breast, Plaintiff proposes that the nipple cover "does not substantially enhance the apparent size of a woman's breast."  Defendants propose that the nipple cover "is not intended to replace or enhance a woman's breast."  Defendants' proposed language that the nipple cover is not intended to enhance a woman's breast would be incorrect.  "Enhance" means either "to make greater," or "to provide with improved, advanced, or sophisticated features."  DICTIONARY.COM, http://dictionary.reference.com/browse/enhance.  In a certain sense, a nipple cover *does* intend to enhance a woman's breast–it serves to cover erect nipples, thereby enhancing the breasts' appearance.

The Court agrees with Defendants that the nipple cover is not designed to replace a breast.  However, the Court also agrees with Plaintiff that the cover is not designed to substantially enhance the apparent size of the breast.  The inventor stated as much during the prosecution history.  Pl.'s Claim Constr. Br. 11; Exh. 9, Remarks, dated 5/24/06 at 11 (P5080).  Since the nipple cover does enhance the breast in a certain manner, and it will inevitably increase the size of the breast at least a small amount, the Court finds that Plaintiff's construction largely incorporates these concerns.  The Court therefore adopts Plaintiff's proposal, with the inclusion of Defendants' language that the

14

nipple cover is also not intended to replace the breast, for this portion of the Court's construction.

With all of the above analysis in mind, the Court's final construction of nipple cover reads: "an article for covering the nipple that extends beyond the nipple and areola; is unsupported by attached straps around the neck, back, shoulders, or arms; and does not replace or substantially enhance the apparent size of a woman's breast."

## 2.      *"Center"*

At the *Markman* hearing, the parties agreed that should the term "center" need construction, then the construction should be "a point that is equally distant from the outer boundaries of the cover."  *See* Transcript of *Markman* Hearing at 51-52.  However, Plaintiff's counsel reiterated Plaintiff's belief that the term need not be construed.  The Court disagrees.

There was lengthy discussion at the *Markman* hearing over the distinction between using the terms 'place' or 'point' to describe the "center" of an object.  There was also dispute over whether or not the patent covered non-hemispherical shaped objects.  *See* Transcript of *Markman* Hearing at 45.  The parties' disputes at the *Markman* hearing persuaded the Court that "center" needed construction.  The parties' agreed construction will be useful to the jury, and the Court therefore adopts the parties' agreed construction as the construction of the Court.

## 3.      *"Gradually tapering"*

For "gradually tapering," Plaintiff argues that no construction is necessary, but suggests that should the Court find otherwise, the construction should be "becoming smaller by steps or degrees." For their proposed construction, Defendants suggest "gradually tapering" means "steadily

diminishing by fine degrees as the entire external boundary is approached from the center."[11]

The parties essentially agree on the "tapering" portion of the term, namely that the nipple cover will proceed in some manner from thicker to thinner material.  Instead, the primary dispute in the parties's constructions boils down to each side's view on the proper construction of the term "gradually."  Defendants argue that "the specification, the figures, and the prosecution history all indicate that the outer surface of the nipple cover must form a continuous curvature."  Defs.' Claim Constr. Br. 21.  In the specification, Defendants point to the following phrase discussing the gradual tapering of the nipple cover: "[t]he edges of the device will gradually taper to be thinner near the edges . . .  [which] will allow the nipple cover to blend with the breast surface . . . for a continuous smoothness."  '606 patent col. 2 ll. 36-39.  In the prosecution history, Defendants also point to the inclusion of the 'continuous curvature' language discussed in connection with the gradual tapering of the nipple cover in noting that "Plaintiff emphasized a 'curvature of outer surface [that] is [a] substantially continuous curvature from [the] centre to [the] periphery.'"  Defs.' Claim Constr. Br. 22.  Based on the dictionary definition of the term 'continuous,' Defendants argue that the patent's references to the 'continuous' nature of the curve means the claims mandate the nipple cover's curvature need be "without a break or irregularity."  Defs.' Claim Constr. Br. 22.  Defendants chose the "steadily diminishing" language in their proposed construction to reflect the idea that the continuous curvature should be without breaks or irregularities.

In response, Plaintiff objects to the "steadily diminishing" language (and Defendant's

---

11

Defendants initially included the phrase "entire external boundary" in a number of their proposed constructions for various terms.  After objection from the Plaintiff at the *Markman* hearing over the inclusion of "entire external boundary" in all of the terms, the Defendants eventually agreed to abandon it as part of the construction of "gradually tapering."

continuous curvature argument) as impermissibly trying to read a limitation into the claims that does not exist.  Plaintiff notes that despite the reference to the continuous curvature language in prior applications of the patent, the 'continuous curvature' language ultimately was not included in the issued patent's claims, thereby indicating the curvature need not necessarily taper without breaks or irregularities.  The Court agrees.

All claim construction begins with the words of the claims.  *See Teleflex*, 299 F.3d at 1324. The only reference to the term "gradually tapering" comes in Claim 1: "the nipple cover having a first thickness . . . and a second thickness [,] . . . and the thickness of the nipple cover gradually tapering from the first thickness to the second thickness."  '606 patent col. 4 ll. 20-24.  As noted by Plaintiff, there is no reference in the claims to a continuous curvature, or a tapering such that it be free from irregularities.

Similarly, there is also no support in the specification mandating a continuous curvature free from irregularities.  As quoted above, Defendant is correct that the specification does reference a "continuous smoothness."  However, the 'continuous smoothness' is meant to reference the transition from the edge of the nipple cover to the surface of the breast, not the gradual tapering of the thickness at the center of the nipple cover to the second thickness at the periphery.  All the specification discusses in relation to the "gradually tapering" term is that the nipple cover should taper off to be thinner at the edges.  There is no discussion in the specification indicating the gradual tapering must be of a continuous smoothness, or that the tapering must steadily diminish to this thinness at the edge of the cover.

The dictionary defines 'gradually' as "taking place, changing, moving, etc., by small degrees or little by little."  DICTIONARY.COM, http://dictionary.reference.com/browse/gradually.     This

definition stands in stark contrast to the dictionary meanings of "continuous" or "steadily," both of which indicate an unfaltering, constant, regular progression.[12]   Had the patent wished to claim a steady progression free from irregularities, the drafter could have used either of these terms, yet chose "gradually."  Giving the terms their ordinary meaning, as the Court must, "gradually" means only that the change takes place "little by little," not necessarily that it is unwavering, constant, or free from irregularity.  Defendants' arguments and proposed construction including "steadily diminishing" suggests a progression to the thinness at the outer edge of the nipple cover that is unwavering, and such a construction finds no support in the patent's specification and claims.  Accordingly, the Court must reject Defendants' proposed language of "steadily diminishing" as attempting to impermissibly import a limitation into the claims.

Instead, the Court adopts Plaintiff's proposed construction as the construction of the Court: "becoming smaller by steps or degrees."  Such a construction reflects the definitions of the terms "gradually" and "tapering," and also incorporates the specification's discussion of the nipple cover's progression from one thickness near the center to a thinner thickness near the edge of the cover without mandating that the progression be entirely free from irregularity.

## 4.    *"Blends smoothly"*

For the term "blends smoothly," Plaintiff offers "is free from irregularities such that it would not show if worn under sheer or thin clothing."  For their proposed construction, Defendants offer "creating a seamless transition from the portion of the breast not covered by the device to the portion

---

[12]

The definitions of the root term "steady" include "free from change, variation, or interruption; uniform; continuous," and "constant, regular, or habitual." Dɪᴄᴛɪᴏɴᴀʀʏ.ᴄᴏᴍ, http://dictionary.reference.com/browse/steadily. As noted above, the term "continuous," at least as it pertains to curvature, means "of or relating to a line or curve that extends without a break or irregularity."

that is covered without deforming the breast."   Many of the same arguments involved in the construction of "gradually tapering" are also present in the parties' proposed constructions of "blends smoothly," namely the dispute over continuous curvature and how smooth the transition from the nipple cover to the breast must be in order to "blend smoothly."

From the claims, it can be determined that it is the periphery of the nipple cover and the curved portion of the breast that are supposed to blend smoothly.   *See* '606 patent col. 4 ll. 24-27 ("[T]he method further includes the step of bending the nipple cover on the breast such that the periphery of the cover blends smoothly with a curved portion of the breast while concealing a nipple shape").   Turning next to the specification, the gradual tapering of the nipple cover's thickness is designed so as to allow for the nipple cover to "blend with the breast surface (as shown in FIG. 2) for a continuous smoothness." '606 patent col. 2 ll. 37-40.   According to the specification, in order to blend smoothly there should be a "continuous smoothness" in the transition from the nipple cover to the shape of the woman's breast.   As noted above, "continuous" means "of or relating to a line or curve that extends without a break or irregularity."   Likewise, the ordinary meaning of the term "smooth" means "having a surface free from irregularities, roughness or projections." AMERICAN HERITAGE DICTIONARY 1643 (4th ed. 2000).

The Federal Circuit has previously construed the term "smooth" under similar circumstances, and in the process provided guidance for the situation at hand.   In *Bausch & Lomb, Inc. v. Barnes-Hind / Hydrocurve, Inc.*, 796 F.2d 443, 450 (Fed. Cir. 1986), the District Court concluded that the accused devices at issue (contact lenses) were not "smooth" because extremely high levels of magnification showed that the surface of the lenses were not "smooth and unsublimated." *Id.*   On appeal, the Federal Circuit held that "smooth means smooth enough to serve the inventor's

purposes." *Id.* After reviewing all of the material before it, the *Bausch & Lomb* court found that the District Court erred in applying such a rigorous requirement for smoothness as the use of an electron microscope to determine the extent of the roughness of the edges. *Id.* Instead, the court found that "smooth enough to serve the inventor's purposes" meant "not to inflame or irritate the eyelid of the wearer or be perceived by him at all when in place." *Id.*

In the present case, the specification teaches that the inventor's purpose is to prevent the unsightliness of bra straps or erect nipples showing through thin clothing. *See* '606 patent col. 1 ll. 16-20. The invention attempts to accomplish this through the use of a nipple cover that blends naturally with the shape of a woman's breast. The prosecution history further shows that the purpose behind having the nipple cover and woman's breast blend smoothly is to enable the user to wear thin clothing "without showing the nipples and areola, and without showing the edges of the cover." *See* Pl.'s Claim Constr. Br., Exh. 3 (Remarks, March 22, 2005) P 4999.

Pulling all of the above considerations together, Federal Circuit precedent teaches that "smooth" means "smooth enough to serve the inventor's purpose." An examination of the specification and prosecution history teaches that the inventor's purpose behind the "blending smoothly" limitation in the claim is to ensure that the edges of the nipple cover itself would not be visible at the point of transition from the surface of the cover to the woman's flesh. In the present circumstances, smooth enough to serve the inventor's purpose means the transition must be smooth enough that the break cannot be seen under thin clothing.

Defendant's proposal incorporates the phrase "seamless transition" as the key element in defining "blending smoothly." The term "seamless" implies a more perfect smoothness than is required. The transition from the nipple cover to the breast need not be "seamless," just not visible

20

when worn under thin clothing.  Defendants also impermissibly attempt to import a limitation into

the claim with the "without deforming the breast" language in their proposal.  Neither the claims nor

the specification indicate any limitation that the smooth transition must not deform the breast–the

focus is instead on visibility.  The Court finds Plaintiff's proposed construction to be in line with the

claims, specification, prosecution history, and most importantly, Federal Circuit precedent.

Accordingly, the Court adopts Plaintiff's proposed construction: "free from irregularities such that

it would not show if worn under sheer or thin clothing," as the construction of the Court.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court interprets the claim language in this case in the manner

set forth above.  For ease of reference, the Court's claim interpretations are set forth in a table

attached to this opinion as Appendix A.


**So ORDERED and SIGNED this 10th day of December, 2007.**


JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE

# APPENDIX A

# DISPUTED TERMS

| CLAIM TERM | PLAINTIFF'S PROPOSED CONSTRUCTION | DEFENDANT'S PROPOSED CONSTRUCTION | COURT'S CONSTRUCTION |
|---|---|---|---|
| **Nipple Cover** | an article for covering the nipple on a human breast, that is not supported by attached straps around the body or by a brassiere, that is smaller than a brassiere, and that does not substantially enhance the apparent size of a woman's breast. | a small, thin, flexible, flesh-colored device that covers the nipple and extends a short distance beyond the nipple and areola and that is not intended to replace or enhance a woman's breast and is not intended to provide support to the breast. | an article for covering the nipple that extends beyond the nipple and areola; is unsupported by attached straps around the neck, back, shoulders, or arms; and does not replace or substantially enhance the apparent size of a woman's breast. |
| **Center** | *No construction necessary.*<br><br>*Alternative construction:* place that is equally distant from the outer boundaries of the cover | the middle point equally distant from the entire external boundary. | a point that is equally distant from the outer boundaries of the cover. |
| **Gradually tapering** | *No construction necessary.*<br><br>*Alternative construction:* becoming smaller by steps or degrees. | steadily diminishing by fine degrees as the entire external boundary is approached from the center. | becoming smaller by steps or degrees. |
| **Blends smoothly** | free from irregularities such that it would not show if worn under sheer or thin clothing. | creating a seamless transition from the portion of the breast not covered by the device to the portion that is covered without deforming the breast. | free from irregularities such that it would not show if worn under sheer or thin clothing. |

# AGREED TERMS

| CLAIM TERM | AGREED CONSTRUCTION | COURT'S CONSTRUCTION |
|---|---|---|
| **At least about one half and less than all** | greater than about half of and less than all of the surface area of a breast. | greater than about half of and less than all of the surface area of a breast. |

| The cover | the nipple cover | the nipple cover |
|---|---|---|
| Proximate | very near. | Very near. |
| Brassiere | a woman's undergarment for supporting the breasts. | a woman's undergarment for supporting the breasts. |
| Conforming to a human breast | *No construction necessary.* | *No construction necessary.* |
| Second thickness | a thickness very near an outer boundary, which is thinner than a thickness very near the center. | a thickness very near an outer boundary, which is thinner than a thickness very near the center. |
| Periphery | the outer boundary. | The outer boundary. |