**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| **RANDI BLACK** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **CE SOIR LINGERIE CO., INC,** | § | |
| **BRAGEL INTERNATIONAL, INC.,** | § | **CIVIL ACTION NO. 2:06-CV-544** |
| **DILLARD'S, INC., FEDERATED** | § | |
| **DEPARTMENT STORES, INC.,** | § | |
| **GAP, INC., THE NEIMAN MARCUS** | § | |
| **GROUP, INC., NORDSTROM, INC., and** | § | |
| **VICTORIA'S SECRET STORES, LLC** | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants' Motion for Summary Judgment For Non-Infringement and Invalidity (Doc. No. 135).  For the reasons discussed herein, Defendants' Motion for Summary Judgment For Non-Infringement (Doc. No. 135) and Invalidity is **GRANTED IN PART** and **DENIED IN PART AS MOOT**.

## BACKGROUND

Plaintiff Randi Black initiated the present lawsuit in an attempt to enforce her intellectual property rights in United States Patent No. 7,152,606 (hereinafter "the '606 patent"), which she claims Defendants are actively infringing.  The '606 patent teaches a method of wearing a nipple cover to conceal a woman's nipple and areola under sheer clothing.  Defendants are manufacturers and retailers of various undergarments and devices designed to support, enhance, or conceal a woman's breasts.

## LEGAL STANDARD

Summary judgment is proper when the pleadings, discovery and affidavits indicate there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(c).  Material facts are those facts which may affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Id.*  In determining whether a genuine issue of material fact exists, the court must view all inferences drawn from the factual record in the light most favorable to the nonmoving party.  *Id.*; *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).  The court may not make credibility determinations.  *Anderson*, 477 U.S. at 255.

The party moving for summary judgment bears the burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986).  On an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case."  *Id.*  at 325.  Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own discovery and affidavits, "set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  Mere conclusory allegations, unsubstantiated assertions, improbable inferences, and unsupported speculation do not create genuine issues of material fact.  *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996).  "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment."  *Anderson*, 477 U.S. at 248.

## ANALYSIS

Defendants filed two dispositive motions advancing a number of theories regarding non-infringement and invalidity.  Included in those theories are arguments claiming the '606 patent is invalid on the grounds it was improperly revived by the PTO after abandonment, that the patent is

invalid as anticipated and obvious in light of prior art (including references that were not before the Examiner), the patent fails the written description requirement, and a number of grounds for non-infringement.  The Court will only address the obviousness issue herein, as the resolution of the obviousness inquiry is sufficient to resolve the case.  The remainder of the invalidity and non-infringement issues are moot in light of the Court's ruling, and are therefore denied as such.

## I.    Obviousness

Defendants argue the '606 patent is invalid as obvious in light of a combination of prior art references.  In particular, Defendants argue one reference that was not before the Examiner renders obvious the portion of the claim language Plaintiff emphasized as novel during prosecution.

An issued patent is presumed valid.  35 U.S.C. § 282; *KSR Int'l Co. v. Teleflex Inc.*, — U.S. ----, 127 S. Ct. 1727, 1737 (2007).  However, after its issuance a patent may be shown to be obvious, and therefore invalid, "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious as of the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  35 U.S.C. § 103(a); *TGIP, Inc. v. AT&T Corp.*, 527 F. Supp. 2d 561, 579 (E.D. Tex. 2007).  To overcome the presumption of validity, a party seeking to invalidate a patent must present clear and convincing evidence that the patent is invalid.  *Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1323 (Fed. Cir. 1999).

A determination of obviousness under § 103 is a legal question based on factual determinations.  *Aguayo v. Universal Instruments Corp.*, 356 F. Supp. 2d 699, 720 (S.D. Tex. 2005).  Although the determination of whether or not a claim is obvious requires factual determinations, the issue may nevertheless be resolved on a motion for summary judgment where there are no material

3

facts in dispute.  *See Sibia Neurosciences, Inc. v. Cadus Pharm. Corp.*, 225 F.3d 1349, 1359 (Fed.

Cir. 2000); *Izzo Golf, Inc. v. King Par Golf Inc.*, — F. Supp. 2d ----, 2008 WL 2445500, at *4

(W.D.N.Y. 2008).  In ruling on the obviousness issue, courts must make explicit findings as to why

the claims of a patent either are or are not obvious, and may not rely on conclusory statements.  *KSR*

*Int'l Co.*, 127 S. Ct. at 1741.

Obviousness is based on whether a "hypothetical person having ordinary skill in the art" with

all prior art references would regard the subject matter of the invention as obvious.  *Standard Oil Co.*

*v. Am. Cyanamid*, 774 F.2d 448, 453-54 (Fed. Cir. 1985).  To prove that a patented invention is

invalid as obvious, the party asserting invalidity must identify prior art references "which alone or

combined with other references would have rendered the invention obvious to one of ordinary skill

in the art at the time of invention."  *Al-Site Corp.*, 174 F.3d at 1323.  *See also KSR Int'l Co.*, 127 S.

Ct. at 1742 (noting the relevant "question is not whether the combination was obvious to the patentee

but whether the combination was obvious to a person with ordinary skill in the art").

The Supreme Court has outlined the framework for applying the statutory language of § 103

to any obviousness determination.  According to the Supreme Court, obviousness depends on an

objective analysis by the fact-finder of: (1) the scope and content of the prior art, (2) the differences

between the claimed invention and the prior art, (3) the level of ordinary skill in the art, and (4) any

relevant secondary considerations that give light to the circumstances surrounding the origin of the

subject matter sought to be patented.  *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18

(1966)).   The relevant secondary considerations that "might be utilized to give light to the

circumstances surrounding the origin of the subject matter sought to be patented" in an obviousness

determination include commercial success, long felt but unsolved needs, failure of others, and the

presence or lack of some motivation to combine or avoid combining prior art teachings. *KSR Int'l Co. v. Teleflex Inc.*, —U.S.----, 127 S. Ct. 1727, 1734 (2007). In addition to the *Graham* factors and secondary considerations, the Supreme Court in *KSR Int'l* also stated that a court undertaking an obviousness analysis may consider "interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an apparent reason to combine known elements in the fashion claimed by the patent at issue." *Id.* at 1740-41. "While the sequence of these questions might be reordered in any particular case, the factors continue to define the inquiry that controls. If a court, or patent examiner, conducts this analysis and concludes the claimed subject matter was obvious, the claim is invalid under § 103." *Id.* at 1734.

In applying these principles, the Supreme Court in *KSR Int'l* noted that "a patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *Id.* at 1741. "This is so because inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known." *Id.* However, "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *Id.* Under the approach outlined by *KSR Int'l*, the entirety of the obviousness inquiry should be expansive and flexible, and should account for common sense. *Id.* at 1739-42.

Defendants argue the '606 patent is invalid as obvious based on a combination of prior art references. According to Defendants, Plaintiff suffered repeated rejections during prosecution of the

'606 patent based on prior art nipple covers and breast pads taught by U.S. Patent No. 4,640,288 (hereinafter "Hattori (I)"), U.S. Patent No. 5,782,672 (hereinafter "Woodley"), U.S. Patent No. 5,394,889 (hereinafter "Morrisey"), and U.S. Patent No. 4,195,639 (hereinafter "Lee"). Defendants argue Plaintiff responded to these repeated rejections by stressing how the tapering of the nipple cover to a thin outer edge in order to blend with the breast differentiated her application from the prior art. *See* Amendment and Response to Official Action Dated April 24, 2006 at 7-10, Application No. 09/152,992; (Doc. No. 135, Ex. 13). However, Defendants claim the Examiner "repeatedly rejected" this reasoning, and only allowed the patent to issue based on Plaintiff amending the claims to method claims that included the requirement that the nipple cover must cover "at least about one half and less than all of the breast." *See* Amendment and Response to Official Action Dated April 24, 2006 at 10-11, Application No. 09/152,992; (Doc. No. 135, Ex. 13). Defendants point to a prior art patent that was not before the Examiner, U.S. Patent No. 4,553,550 (hereinafter "Hattori (II)"), as disclosing this aspect of the subject matter. Based on the teachings of Hattori (II) in combination with the other prior art, Defendants argue the '606 patent offers nothing that would not have been obvious to one of ordinary skill in the art at the time of invention, particularly in light of the Supreme Court's emphasis on a flexible, common sense approach to the obviousness inquiry.

In response, Plaintiff argues simply that Defendants failed to meet the burden of proving obviousness by clear and convincing evidence. Plaintiff accuses Defendants of analyzing the matter purely with a hindsight bias, rather than the perspective of one of ordinary skill in the art at the time of invention. Specifically, Plaintiff argues Defendants failed to "identify, with specificity and with factual support, the reasons why one of ordinary skill in the art would have attempted and been successful in adding up the disclosures of those references to arrive at the claimed invention." PL.'S

OPP'N TO DEF.'S MOT. FOR SUMM. J. FOR NON-INFRINGEMENT AND INVALIDITY at 22.  Finally,

Plaintiff also argues Defendants failed to make the basic obviousness showing because they: (1)

failed to conduct a *Graham* analysis of the obviousness factors, (2) submitted no expert testimony

as to obviousness, and (3) failed to identify any evidence indicating the commercial success of their

products was due to anything other than utilization of the invention in the '606 patent.

After conducting the appropriate analysis, the Court agrees with Defendants.  Based in large

part on the common sense approach emphasized by the Supreme Court in *KSR Int'l*, the Court finds

that one of ordinary skill in the art at the time of invention, armed with all pertinent prior art

references, would have concluded that the teachings of the '606 patent offer nothing over the prior

art save obvious common sense adjustments.

**A.      Level of Ordinary Skill in the Art**

The obviousness analysis begins with an objective determination of the level of ordinary skill

in the art.  The claims of the patent at issue describe a method of wearing a nipple cover.  Defendants

argue there is no specialized training necessary as it relates to the patent and prior art at issue, while

Plaintiff provided an extensive expert report discussing why one of skill in the art would not have

thought the subject of the '606 patent to be obvious.  Despite the lengthy expert report, Plaintiff has

provided no compelling argument as to why the Court should consider there to be any particularly

specialized skill in the art.  The subject matter of the invention is essentially a method for wearing

an article of clothing.  Accordingly, the Court finds there is no specialized skill involved in the art

of designing a method of wearing a nipple cover as it relates to the patent and prior art at issue.

Instead, here the level of ordinary skill in the art is equivalent to that of a "backyard inventor," or a

person who saw a common problem and tried to address the problem with a simple solution.  *Izzo*

*Golf, Inc.*, — F. Supp. 2d ----, 2008 WL 2445500, at *5 (finding no specialized skill involved in the art of golf bag design).

**B.      Scope and Content of the Prior Art**

The second factor the Court must examine is the scope and content of the prior art, which in this field can best be described as broad and highly nuanced.  The overarching issue Plaintiff and a host of other inventors have attempted to tackle centers around a woman's concern over the appearance of her breasts.  Inventors in the field have addressed problems such as a mastectomy patient seeking to restore a pre-surgical appearance, a new mother trying to prevent milk from appearing on clothing during lactation, a woman seeking to enhance the apparent size of her breasts, or a woman simply trying to hide protruding nipples from view under sheer clothing.  With the '606 patent, Plaintiff offers another solution whereby a woman can hide erect nipples under sheer clothing.

Aside from the modern brassiere, the idea of wearing a thin covering over the breasts that could hide protruding nipples under thin clothing has been in the prior art since at least 1930, when Mildred Mather obtained U.S. Patent No. 1,783,512 (hereinafter "Mather" or "the '512 patent").  *See* U.S. Patent No. 1,783,512 col. 1:1-23.  The Mather patent discussed the idea of providing a "breast covering or protector which will to a great extent obscure the nipple so that the same will not be unduly noticeable when a dress or sweater is worn," that would be "positioned centrally of the nipple," and would use an "adhesive to hold the [fabric] in place."  '512 patent col. 1:19-29; '512 patent col. 1:63-66.

Since the Mather patent, a host of other inventors have branched out to address the many problems women may face with breast appearance.  Early patents in the field were largely concerned

8

with improving the appearance of the breast inside the brassiere.  In 1947, Ruth E. Gerst acquired U.S. Patent No. 2,427,851 (hereinafter "Gerst" or "the '851 patent"), which described a breast pad designed to improve the appearance of "an underdeveloped female breast."  '851 patent col. 1:1-3. While designed to enhance the breast, the invention was also concerned with creating an appearance similar to that of a woman's breasts, and therefore emphasized the pad be free of seams to present a "clean inner and outer surface at all times."  U.S. Patent No. 2,427,851 col. 1:1-17.  The next year, U.S. Patent No. 2,454,535 (hereinafter "the '535 patent" or "Warner") attempted to tackle the problem certain women faced with filling out the generally conical-shaped brassieres that were prevalent at the time by offering a breast shield designed to improve the appearance of a breast by "shaping and completely filling out the apex of the brassiere cup into its preformed, pointed and generally conical configuration and at the same time providing a soft and natural-shaped cushion or pad for engagement with the breast and nipple for protection."  U.S. Patent No. 2,454,535 col. 1:32-38.  Over the years, numerous other solutions have been offered as means of utilizing bust pads to improve or enhance the appearance of a woman's breast under a brassiere.  *See, e.g.,* U.S. Patent No. 5,326,305 col. 3:10 - col. 4:5 (describing breast pad designed to adhere to the inside of a woman's garment); U.S. Patent No. 5,603,653 col. 8:45 - col. 9:12 (describing breast pad designed to absorb perspiration); U.S. Patent No. 5,522,892 col. 1:34-62 (describing breast augmentation pad for insertion in clothing).

As the field progressed, inventors began to offer other utilitarian improvements to the bust pad itself.  In 1953, another inventor patented a waterproof bust pad designed both for use while swimming, and also to allow for easy laundering. U.S. Patent No. 2,627,606 col. 1:4-21 (hereinafter "De Grandis").  The De Grandis patent again stressed the desire for comfort to the user (proposing

foam rubber for the material), and also the need for the pad to "blend into the human form in order to thereby avoid embarrassing detection of its use." U.S. Patent No. 2,627,606 col.1:18-21; col. 1:4-7. Eventually the idea of providing waterproof or absorbent bust pads burgeoned into an entire series of patents aimed to solve the problems lactating mothers face in discreetly keeping discharged milk off their clothing while still projecting a normal breast appearance and maximizing comfort.[1] The De Grandis patent and most of the other bust pad solutions of the time were largely meant to be utilized in conjunction with a brassiere.

In 1951, a patentee offered an early solution to eliminating the brassiere altogether.  In U.S. Patent No. 2,553,825 (hereinafter "the '825 patent" or "Langs"), inventor Charles Langs outlined a breast cover "which is entirely independent of either outer or under garments and are securely held in place without the use of ribbons, straps or similar supporting means." U.S. Patent No. 2,553,825 col.1:4-8.  The Langs patent also explained the cover to be "cup-shaped pockets of sufficient size to completely conceal the breasts without the assistance of any other garment and being free from connection with one another." '825 patent col. 1:9-14.  Langs proposed an adhesive solution to

---

[1]

The series of patents targeting issues facing lactating mothers began with emphasizing the absorption properties of the bust pad, then moved into concerns of comfort, sanitation, conformity, shape, and discreteness. *See, e.g.,* U.S. Patent No. 3,356,090 col. 1:1 - col. 2:8 (describing a layered and absorbent breast pad for nursing mothers); U.S. Patent No. 4,074,721 col. 1:23-26 (describing a breast pad where the surface of the pad in contact with the breast remains dry); U.S. Patent No. 4,193,404 col. 1:35-49 (describing a stretchable and conformable nursing pad); U.S. Patent No. 4,674,510 col. 2:5-60 (describing disposable and sanitary breast pad to be inserted into brassiere); U.S. Patent No. 4,700,699 col. 1:57-60 (describing nursing pad designed specifically to conform to shape of breast and offer reduced visibility); U.S. Patent No. 5,843,062 col. 1:38-53 (describing contoured pad designed to absorb fluid while continuously expanding and contracting to conform to size of breast); U.S. Patent No. 6,036,577 col. 1:57-67 (describing disposable breast pad that does not require brassiere for support); U.S. Patent No. 5,394,889 (describing apparatus for controlling lactation that is shaped to conform to human breast, and also a method for controlling lactation by placing absorbent apparatus on the breast).

attach the cover directly to the area around the breast.[2] '825 patent col. 1:15-26.  As the use of

adhesives became more practical, other inventors attempted to offer solutions to women dealing with

the after-effects of mastectomies.  By utilizing more effective adhesives and lighter materials,

inventors attempted to offer a realistic replacement to the breast itself whereby a brassiere was

unnecessary for a woman to still project a pre-operation appearance of her post-mastectomy breasts.

*See, e.g.,* U.S. Patent No. 5,071,433 col. 1:28-56 (describing flexible breast prosthesis device

designed to imitate the shape of a normal breast, and using skin-friendly adhesive to attach device);

U.S. Patent No. 4,195,639 (describing breast prosthesis which can be manufactured to easily match

the normal breast in size, color, and weight).

Eliminating the brassiere also opened the field for a number of inventors to offer solutions

to women seeking to avoid the discomfort or unsightliness of a bra while still maintaining a sense

of privacy.  One of the oft-cited alternative solutions in this area of the field is the nipple cover.  One

early variation described a "new, unique and attractive device of the type similar to an adhesive

bandage of the type used for first-aid to conceal women's nipples and which is basically simple in

construction and consequently economical to manufacture."  U.S. Patent No. 4,333,471 col. 1:7-12

(hereinafter "Nakai" or "'the 471 patent").  While the '471 patent discussed a nipple cover "in the

form of a sheet of paper for covering women's nipples," a later variation offered an adhesive pad

---

[2]

    In 1952, one year after the issuance of the '825 patent, the same inventor patented another breast cover offering a different type of attachment device in lieu of a normal adhesive.  *See* U.S. Patent No. 2,596,567 col. 1:1-26.  This new invention noted the problems with adhesives losing tacky characteristics, and thereby limiting the ability of reuse of the cover.  *See* '567 patent col. 2:21-24.  The adhesive issue would become either the subject of a number of later patents, or included as a feature therein.  *See, e.g.,* U.S. Patent No. 2,633,440 col. 1:1-52 (describing a double-face adhesive to attach articles of apparel, and specifically discussing "strapless, stayless brassieres"); U.S. Patent No. 6,200,195 col. 1:5-40 (describing adhesive pad and method for production); U.S. Patent no. 4,333,471 col. 1:60 - col. 2:7 (describing nipple cover attached with pressure-sensitive adhesive).

designed for use with a nipple cover, while stressing the importance of conformity with the shape and color of the breast for a natural breast appearance under thin clothing.  *See* U.S. Patent No. 4,640,288 col. 2:6-10, col. 2:44-48 (hereinafter "Hattori (I)" or "the '288 patent").  The same inventor of Hattori (I) would later patent another clothing wearing device similar to a nipple cover whereby the device was attached using hooks and loops.  *See* U.S. Patent No. 4,553,550 col. 13:26-37 (hereinafter "Hattori (II)" or "the '550 patent").  Similar to the Hattori patents, yet another variation of the nipple cover also sought to "permit a woman to attractively and tastefully display her naturally endowed beauty" by offering a nipple pad with a "padded liner and [] pliable cover formed of supple material to conform to a nipple of a breast of a woman," with "said padded [liner having] a thickness which increases from said periphery to said central portion of the pliable cover."

*See* U.S. Patent No. 5,782,672 col. 2:16-18, col. 4:30-38 (hereinafter "Woodley" or "the '672 patent").

With the '606 patent, Plaintiff was generally attempting to tackle many of the same issues as the Hattori (I), Hattori (II), Nakai, and Woodley patents.  While the entirety of the field represents prior art, these four patents in particular would present numerous problems for Plaintiff during prosecution of the '606 patent application.

What the Court has outlined herein merely scratches the surface of the prior art in this field.  Accordingly, the Court concludes that the scope and content of the prior art in this field is extremely broad.

###    C.    Differences Between Claimed Invention and Prior Art

The third *Graham* factor, and perhaps the most important, is the analysis of the differences between the claimed invention and the prior art.  During prosecution, Plaintiff found great difficulty

in distinguishing her application from the vast field of prior art.  In particular, the examiner rejected

Plaintiff's claims as obvious multiple times based on the teachings of patents such as Woodley (the

'672 patent), Hattori (I) (the '288 patent), Nakai (the '471 patent), U.S. Patent No. 4,195,639

(hereinafter "Lee" or "the '639 patent"), and U.S. Patent No. 5,394,889 (hereinafter "Morrissey" or

"the '889 patent").  Defendants argue Plaintiff was only able to overcome the examiner's rejections

by amending her claims to method claims and including the limitation that her nipple cover must

"cover at least about one half and less than all of the breast."  *See* '606 patent col. 4:15-19.

Defendants further argue the coverage limitation which Plaintiff included to overcome rejection was

already taught by Hattori (II), which was not before the examiner during prosecution.  In her

response and sur-reply, Plaintiff does not dispute Defendants' assertion that she overcame the

examiner's rejections largely by including the limitation that the nipple cover must "cover at least

about one half and less than all of the breast."  Instead, Plaintiff argues Defendants failed to

undertake the necessary analysis in an obviousness determination, and therefore their obviousness

arguments must fail.  Plaintiff also points to her expert's report as evidence that the invention

disclosed in the '606 patent would not have been obvious to one of ordinary skill in the art at the

time of invention.  After due consideration of the evidence, the Court concludes that the differences

between the claimed invention and the prior art, to the extent there are any, are minuscule.

### 1.      Claim 1

Claim 1 of the '606 patent is an independent claim describing "[a] method of covering a

nipple on a human breast."  '606 patent col. 4:12-13.  Included in the claim are limitations on the

nipple cover itself, and also steps for utilizing said nipple cover.  After examination of the relevant

prior art, the Court concludes there is nothing in claim 1 that is not also found in the prior art.

The first line of claim 1 describes a method of "covering a nipple on a human breast," and immediately goes on to discuss a "nipple cover" as the means of achieving the coverage.  The nipple cover as a concept is not novel, with variations having been patented specifically titled as a "nipple cover" as early as 1981 by Nakai.  '471 patent col. 2:43-60.  Since Nakai, the nipple cover concept was also included in the claims of a number of other patents, including Woodley, Hattori (I), and Hattori (II).  *E.g.,* '672 patent col. 4:21-23 (claiming "[a] nipple pad for protecting and concealing a nipple and an areola of a breast of a woman"); '288 patent col. 4:49 (describing "[a]n adhesive pad for use on a human body"); '550 patent col. 13:26-37 (describing "two-piece breast undergarment comprising a breast covering and a sheet-like retainer").

Claim 1 of the '606 patent also discusses certain limitations for the nipple cover, including that it have a "center," and is "compris[ed] [of] a flexible material for conforming to a human breast."  '606 patent col. 4:13-15.  The nipple cover in Nakai discussed a "circular shape" in the claims, and also shows numerous figures with circular nipple covers.  *See* '471 patent col. 2:53-54; '471 patent figs. 1-2.  A circular nipple cover would generally have a central point or area.  Nipple covers or pads with a "center" are also shown in Woodley, Hattori (II) and Reidmiller (U.S. Patent No. 5,843,062).  *E.g.,* '672 patent col. 4: 25-39 (describing "concave central portion" of pliable nipple cover); '672 patent figs. 1-4; '550 patent figs. 31, 37 (showing hemispherical nipple covers with nipple at center of cover); '062 patent col. 8:46-50 (describing nipple pad "including a center, a perimeter, a first area, and a second area, wherein first area is located near said center").  The idea that a nipple cover be constructed of a flexible material for the purpose of conforming to the breast

14

is also shown in Nakai, Hattori (I), Hattori (II), and Woodley.[3]  *E.g.,* '471 patent col. 2:43-54 (describing nipple cover with "flexible paper backing" and circular shape); '288 patent col. 4:49-51 (describing adhesive pad comprised of flexible plastic material); '550 patent col. 11:67-68 (describing breast covering as a "soft sheet"); '672 patent col. 2:36-39 (describing pliable cover "shaped to conform to the nipple and areola of a woman's breast").

Next, claim 1 turns to the method's steps.  First, the claim describes "placing the nipple cover directly on a human breast so as to cover at least about one half and less than all of the breast, with the center of the cover proximate the nipple."  '606 patent col. 4:16-19.  The idea of "placing the nipple cover directly on a human breast," and having "the center of the cover proximate the nipple" is taught by Nakai, Hattori (I), Hattori (II), Woodley, and U.S. Patent No. 6,036,577.  *E.g.,* '471 patent col. 1:31-33 ("The invention can be used sufficiently by only placing it on the nipples and surrounding areas of the breasts"); '288 patent col. 3:64 - col. 4:4 ("The pad ... is placed centrally against her nipple..."); '288 patent fig. 4; '672 patent fig. 1; '550 patent figs. 31, 37; '550 patent col. 12:13-15; U.S. Patent No. 6,036,577 col. 3:27-29 (describing pad whereby "[t]he body is then positioned on the breast so that the center of the pad covers the nipple.").

The remaining portion of the claim language in this section, which indicates the cover must "cover at least about one half and less than all of the breast," was the primary focus of Defendants' motion for summary judgment based on obviousness.  As discussed briefly above, Defendants claim this portion of the claim language was the sole basis Plaintiff distinguished the '606 patent application from the prior art during prosecution.  However, as Defendants point out, Hattori (II) was

---

[3]

A number of other patents also show the nipple cover, nipple pad or bust pad conforming to a human breast.

not before the patent examiner during prosecution.  Based on Hattori (II), Defendants argue this portion of the claim language was also taught in the prior art at the time of invention.  The Court agrees that Hattori (II) teaches this limitation.  Figure 37 of the Hattori (II) patent shows "a cup-shaped breast covering for covering substantially all of the breast." '550 patent col. 12:34-36; '550 patent fig. 37.  Hattori (II) also discusses a "breast covering ... [with] such a size as to cover only the nipple and the region therearound." '550 patent col. 11:65-67.  By using the phrases "substantially all" and "the region therearound," the patentee was indicating the covering does not cover the entire breast, but should cover most of it–in other words, something approximately more than just the nipple and areola, but not quite all of the breast.  Aside from Hattori (II), the idea of expanding the nipple cover to cover the area around the nipple and areola was also claimed in U.S. Patent No. 1,783,512.  In the '512 patent (which is one of the oldest patents in the field), the patentee claimed "[a] breast covering ... adapted to extend over the nipple of the breast and portions at opposite sides thereof." '512 patent col. 2:48-51.  Other prior art references teach nipple covers intended to cover all of the breast, some intended to cover only the nipple, and others intended to cover the nipple and surrounding area.  *E.g.,* U.S. Patent No. 2,596,567 col. 3:5-13 (breast cover designed to cover entire breast); '471 patent col. 2:43-45 (nipple cover for covering nipples); '672 patent col. 4:20-23 (nipple pad for covering nipple and areola).  Based on these teachings, the Court concludes there is very little difference as to the intended amount of breast coverage between the claim language of the '606 patent and the prior art.

Moving to the next portion of claim 1, the claim discusses the "nipple cover having a first thickness proximate the center and a second thickness proximate a periphery thereof, and the thickness of the nipple cover gradually tapering from the first thickness to the second thickness."

16

'606 patent col. 4:19-23.  This limitation was discussed in remarkably similar terminology in Woodley, which claimed a nipple pad comprised of a "thickness which increases from said periphery to said central portion of the pliable cover."  '672 patent col. 4:36-38; '672 patent col. 3:33-35. Woodley also emphasized contouring, and the importance of a concave shape.  '672 patent col. 3:29-38.  By claiming an increasing thickness from the periphery to the cover to the center, and also by emphasizing the contouring and concave shape of the cover, Woodley was implying at least two levels of thickness with a gradual tapering from one level to the next.[4]  Other prior art patents have also shown a gradual tapering from a thicker center of a bust pad to a thinner area at the periphery. *See, e.g.,* '062 patent figs. 1B, 7; U.S. Patent No. 4,398,981 col. 1:53-56 (describing brassiere pad comprising "a dome shaped molded pad having thickness which progressively decreases from the crest of the dome toward the periphery.").

Finally, the last portion of claim 1 discusses "the step of bending the nipple cover on the breast such that the periphery of the cover blends smoothly with a curved portion of the breast while concealing a nipple shape."  '606 patent col. 4:23-26.  Every aspect of this portion of the claim language is also found in the prior art.  The idea of a curved or bended nipple cover is taught in (among other references) Woodley and Hattori (II).  *E.g.*, '550 patent col. 12:24-25 (describing cover as "substantially semicircular or crescent-shaped"); '672 patent col. 2:36-37 ("The pliable cover is shaped to conform to the nipple and areola of a woman's breast").  Woodley, among other patents,

---

[4]
An emphasis on contouring implies there would be no spike in the increase of thickness, but rather a smooth transition from thinness to thickness.

also teaches concealing the nipple shape.[5]  *E.g.*, '672 patent col. 2:46-51 (discussing invention's purpose as "soften[ing] the contours of the nipples" and "tastefully concealing the nipples").  In addition, the portion of the language discussing bending the cover so that the periphery blends smoothly with the curvature of the breast exhibits little difference from the intended purpose of the teachings of Nakai, Woodley, and Hattori (I).  In Nakai, the patentee claimed a nipple cover made of a thin, flexible paper-like material with indentation cuts on the periphery to "avoid[] the formation of wrinkles or creases" when secured to the skin.  '471 patent col. 2:20-23.  Using a material with the thinness similar to that of paper would inherently blend as smoothly as possible into the breast, and the indentation cuts discussed in the Nakai specification indicate the patentee was seeking to avoid "wrinkles or creases" for the smoothest blend possible.  In Woodley, the patentee emphasized the decreasing thickness from the center of the cover to the periphery for conformity with the nipple and breast.  '672 patent col. 4:25-38.  Emphasizing a decreasing thinness as the cover approaches the periphery implies the patentee was attempting to have the cover blend as smoothly as possible with the remainder of the breast.  Finally, Hattori (I) also discusses how its nipple cover protects the nipple from "being rubbed or irritated by [the wearer's] clothes while the pad merges into her skin to be rendered unnoticeable."  '288 patent col. 4:4-7.  The teachings of these patents bear little to no difference from the teaching of the '606 patent.

Having examined all of claim 1, the Court finds nothing in claim 1 that was not already present in some form in the prior art.

## 2.    Claim 2

---

[5]

Any number of the bust pads in the prior art would also teach concealing the nipple's shape through coverage of the breast.  *See, e.g.,* U.S. Patent No. 2,596,567 figs. 1-3.

Claim 2 of the '606 patent is a dependent claim.  The claim discusses "[t]he method of claim 1, further comprising a step of selecting a nipple cover from a plurality of colors of nipple covers and from a plurality of shapes and sizes for covering at least about one half of the breast and less than all of the breast."  After careful examination of the prior art, the Court finds no difference between claim 2 and the teachings of the prior art.  The idea that a nipple cover could be in a range of colors, shapes and sizes was taught in Woodley and Hattori (II).  Woodley outlines one nipple cover embodiment with a "flesh tone color," then discusses other embodiments including a "nipple pad made of transparent materials or vividly colored materials.  '672 patent col. 3:39-42.  Hattori (II) is even more on point:

> "The breast covering ... is skin colored or white or whitish so that it will not catch the eye.  Reversely, in order to utilize the breast covering as a positive element for fashion, it may be a bright color, such as golden color and silver color, or red, yellow, green, or blue or a mixture of these colors.  As for the shape of the breast covering, it is round, star-shaped, flower-shaped or heart-shaped, but it is not limited to these shapes and any other shape may be used."

'550 patent col. 11:67 - col. 12:8.  The idea that the cover would be made in a variety of sizes to ensure coverage of "at least about one half and less than all of the breast" is similar to the many nipples covers and bust pads where the patentee emphasized expanding material for optimal coverage.  For example, Hattori (II) foresaw the idea of unlimited shapes and sizes as part of the breast coverage.  At the bottom of column 11, the Hattori (II) specification begins to discuss a breast covering of "such a size as to cover only the nipple and the region therearound."  '550 patent col. 11:65-67.  Immediately after discussing how the breast covering should cover the nipple and area therearound, Hattori (II) thereafter discusses how the range of colors, sizes and shapes are unlimited, which indicates the patentee saw the necessity of providing for varying degrees of sizes to cover the

19

desired area.  '550 patent col. 11:67 - col. 12:8.  Other patents have discussed various sizes and

shapes for breast covering devices.  *See, e.g.,* U.S. Patent No. 2,664,571 col. 3:28-47 (noting how

"various changes in the size, shape and arrangement of the several features are within the

contemplation of the invention").  Still other patents have discussed using flexible material to ensure

conformity with the breast even while breast size may change during wearing.  *See, e.g.,* U.S. Patent

No. 6,036,577 col. 3:29-31 (describing disposable breast pad that will expand to fit any breast size

or shape); U.S. Patent No. 5,843,062 col. 3:26-52 (discussing breast pad that "will continuously

expand and contract to continuously adapt to the current size of the woman's breast).

Based primarily on the teachings of Hattori (II), Woodley, and Reidmiller (the '062 patent),

the Court concludes there is no difference between the teachings of claim 2 and the prior art.

### 3.    Claim 3

Claim 3 of the '606 patent is another dependent claim, and claims "[t]he method of claim 2,

further comprising a step of wearing clothing in contact with an outer surface of the nipple cover

without a brassiere."  '606 patent col. 4:33-35.  This aspect of the claim language is outlined at

length in Hattori (II):

> "[S]ince there is no need for shoulder strings like those required by
> brassieres, there is an advantage that even a garment having no
> portion which covers the shoulders, such as a tank top dress, may be
> worn.  Further, by wearing the breast coverings under a bathing suit
> at the time of swimming, the shape of the breasts can be corrected and
> pleasant swimming can be enjoyed."

'550 patent col. 13:9-17.  Various other patents have also discussed the idea of wearing a pad to

cover the breast without the necessity of a brassiere, but still in contact with outer clothing.  In

particular, U.S. Patent No. 6,036,577 outlines a breast pad whereby "[n]o brassiere is required to

20

further secure the pad," and includes "[a]n outer layer [that] is impermeable to moisture and prevents passage of fluid thereby preventing staining and/or wetting of any clothing in contact with the outer layer. '577 patent col. 2:48-51; '577 patent col. 3:34.  Woodley also teaches a nipple cover as an alternative to a brassiere, and is "primarily intended that the [nipple pad] be worn underneath a variety of garments." '672 patent col. 2:49-51, 4:10-14.

In light of Hattori (II), Woodley, and the '577 patent, the Court finds no difference between the teachings of claim 3 and the prior art.

### 4.    Claim 4

Claim 4 of the '606 patent claims "[t]he method of claim 1, wherein in the step of placing, the cover is affixed to the human breast by adhesive." '606 patent col. 4:36-37.  The Court has already briefly discussed how adhesives came to be introduced into prior art bust pads.  *See supra* note 3.  The idea of using an adhesive to affix a nipple cover can be found throughout the prior art, including in Nakai, Woodley, and Hattori (I).  *E.g.,* '471 patent col. 2:42-52; '672 patent col. 4:39-45; '288 patent col. 4:48-68.  Nothing in the '606 patent indicates the method of using the adhesives discussed therein is any different from the means of using adhesives to affix the nipple covers in Nakai, Woodley, and Hattori (I).

### 5.    Claim 5

Finally, claim 5 of the '606 patent discusses "[t]he method of claim 1 further comprising a step of selecting the nipple cover with a color matching a skin color of the breast upon which the cover is placed." '606 patent col. 4:38-40.  This limitation is also not unique to the '606 patent, as it is found in the claims of the Woodley patent: "[t]he nipple pad according to claim 1, wherein said pliable cover has a skin-toned color." '672 patent col. 4: 48-49.  The skin colored breast covering

idea is also discussed in Hattori (II).  '550 patent col. 11:67-68.  While other patents have also

discussed the idea of skin colored breast coverings, the teachings of Woodley and Hattori (II) are

sufficient to show there is no difference between claim 5 of the '606 patent and the prior art.

### D.      Relevant Secondary Considerations

In addition to examining the prior art as it relates to the claims of the '606 patent, the final

factor courts may also consider are any relevant secondary considerations.   These catch-all

considerations are otherwise referred to as "objective indicia of nonobviousness." *Finisar Corp. v.*

*DirecTV Group, Inc.*, 523 F. 3d 1323, 1339 (Fed. Cir. 2008).   Some of the relevant secondary

considerations include commercial success, long felt but unsolved needs, failure of others, and the

presence or lack of some motivation to combine or avoid combining prior art teachings. *KSR Int'l*

*Co.*, 127 S. Ct. at 1734.  The only reference to the secondary considerations in Plaintiff's briefing is

a short reference to Plaintiff's expert's report, and a conclusory statement that Defendants failed to

prove the commercial success of their products is "due to anything other than their utilization of the

invention in the '606 patent."  PL.'S OPP'N TO DEFS.' MOT. FOR SUMM. J. at 24.  Plaintiff's expert

also argues there was a long felt and unmet need for providing coverage of the nipple without bra

straps, which she claims the prior art had not satisfied.

In *Sjolund v. Musland*, the Federal Circuit stated that commercial success "is relevant only

if it flows from the merits of the *claimed* invention." *Sjolund v. Musland*, 847 F.2d 1573, 1582 (Fed.

Cir. 1988).  As a result, the party asserting commercial success has the burden of proving a "nexus

between the commercial success and the claimed invention." *Tokyo Keiso Co., Ltd. v. SMC Corp.*,

533 F. Supp. 2d 1047, 1060 (C.D. Cal. 2007).  A patentee cannot demonstrate commercial success

unless they can show that the commercial success of the product results from the claimed invention,

and also that the success was due to the merits of the claimed invention beyond what was readily available in the prior art. *J.T. Eaton & Co. v. Atlantic Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997).

In Plaintiff's expert's report,[6] Dr. Shari Dragoo argues the commercial success of *Defendants'* product, the NuBra, indicates the nonobviousness of the '606 patent.  Dragoo arrived at the conclusion based on the widespread sales of the NuBra, as well as her own conclusion that the NuBra embodied the features of the '606 patent.  However, Dragoo offers no insight as to how the NuBra's commercial success resulted from the features of the '606 patent, and as such, Plaintiff failed to establish a nexus between the commercial success of the product and the features of the patent.  While Dragoo claims the size aspect taught by the '606 patent produced unexpected benefits, there was nothing in the report which directly indicated the NuBra met with success because it covered more than half but less than all of the breast, as the '606 patent teaches.  To the extent it can be said the NuBra met with success based on its size, the '606 patent is one patent among many that teaches various sizes for nipple covers.  It would be virtually impossible to link the commercial success of the NuBra to the '606 patent based on one feature taught by a plethora of prior art.  The size aspect aside, Dragoo provided essentially no discussion indicating the NuBra met with success as a result of utilizing the '606 patent's teachings as opposed to other prior art teachings.  The Court has already outlined the extensive scope of prior art, including a small combination of patents that teach everything in the '606 patent.  Without evidence indicating it was the '606 patent's features as opposed to features of the other prior art, Plaintiff cannot show commercial success based on her

---

[6]

Defendants lodged various to Dragoo's expert report.  For purposes of this order, the Court overrules Defendants objections, and will consider the report in its entirety.

patent.[7]  Therefore, even drawing all inferences in Plaintiff's favor, there is no genuine issue as to whether Defendants' commercial success is due to the claimed invention.

As noted, Dragoo's expert report provided the entirety of Plaintiff's argument as to commercial success.  In addition to failing to establish the appropriate nexus, the Court is also unpersuaded by Dragoo's conclusion on the commercial success issue. The report ignores Plaintiff's unsuccessful attempt to commercialize the embodiment of the '606 patent.  Defendants presented evidence of an exclusive licensing agreement between Plaintiff and Virginia Hall, Inc., whereby Virginia Hall would manufacture and distribute the products described in the application that would mature into the '606 patent, and Virginia Hall would pay royalties to Plaintiff on any product sales. DEFS.' MOT. FOR SUMM. J. FOR NON-INFRINGEMENT AND INVALIDITY, Ex. 19.  Defendants also pointed to the deposition of Ann Deal of Ce Soir Lingerie, who attempted to sell Plaintiff's prototype product to potential buyers such as Victoria's Secret, Macy's and Dillard's.[8]  When Ms. Deal took Plaintiff's prototype to these potential buyers, she claimed the potential buyers "laughed," saying the product "was like a clown's nose," and "didn't work."  Deal Dep. at 250:11-14; Deal Dep. at 256:2-

---

[7]

Defendants cited evidence indicating the commercial success of the NuBra can largely be attributed to features not taught by the '606 patent.  Specifically, Defendants cite the testimony of David Chen, President of Defendant Bragel International, Inc., as evidence that the clasp on the NuBra is a key feature in the commercial success of the product. Chen Dep. at 102:24 - 103:3 (Doc. No. 135, Ex. 8).  According to Chen, the clasp causes the breasts to pull together to create cleavage, and also an appearance of greater breast size.  Chen Dep. at 102:24 - 103:3.  Defendants argue the '606 patent does not disclose the NuBra's clasp, and also note the '606 patent specifically disclaims any supporting or enhancement effect, see '606 patent col. 2:24-31, which they argue the NuBra provides with the clasp.  Finally, Defendants also argue the teaching of the '606 patent, to the extent it discloses separate nipple covers designed to cover a substantial portion of the breast, met with failure in prior art solutions disclosing similar embodiments because the nipple covers caused the breasts to sag.  See Chen Dep. at 28:13-23; Chen Dep. at 29:13-17.  By pulling together the breasts to create cleavage, Defendants' claim the NuBra avoided this problem altogether.

[8]

In her deposition, Ms. Deal discussed how Lindsey Crosby, a representative of Virginia Hall who was working with Plaintiff to produce prototypes of Plaintiff's product, provided Ms. Deal with a prototype product to take to buyers. See Deal Dep. at 250:8-14 (Doc. No. 135, Ex. 15);  Black Dep. at 41:8 - 43:19; Black Dep. at 43:20-22; (Doc. No. 135, Ex. 6).

5; (Doc. No. 135, Ex. 6).  Plaintiff never received any money as a result of her licensing agreement with Virginia Hall.  *See* Black Dep. at 43:16-18.  Plaintiff does not dispute Defendants' portrayal of her attempts to produce an embodiment of the '606 patent, and Dragoo's failure to address Plaintiff's attempt to commercialize undercuts Dragoo's commercial success conclusions.

In her brief, Plaintiff essentially attempted to shift the burden to Defendants on the commercial success issue by citing Dragoo's report and arguing Defendants failed to identify any evidence indicating the commercial success was due to anything other than utilization of the '606 patent's disclosed features.  However, the burden is on the patentee to make the requisite showing of a nexus between commercial success and the patented invention–only then does the burden shift to the challenger to prove commercial success was due to factors extraneous to the patented invention.  *J.T. Eaton & Co.*, 106 F.3d at 1571.  As noted, Plaintiff failed to establish a nexus between the NuBra's commercial success and the patented invention, and therefore she failed to meet her burden.

Plaintiff also argued there was a long felt but unmet need for devices whereby a woman can cover her breasts without the discomfort or unsightliness of a brassiere.  However, Plaintiff cannot claim there was a long felt but unmet need for nipple covers.  Various other prior art solutions disclose nipple covers, and the '606 patent offers but one solution among many.  Defendants' product, the NuBra, offers yet another solution.  To the extent Plaintiff is arguing there was a long felt but unmet need for larger nipple covers or breast coverings, the Court has already outlined various prior art patents that disclose such coverings.  Without credible evidence indicating the NuBra incorporates the features of the '606 patent and is successful as a result thereof, Plaintiff cannot claim that her solution actually satisfied any need.  This is particularly true since her own

attempts at producing a commercial embodiment of the '606 patent's teachings met with failure.

Based on the evidence before the Court, the Court cannot conclude that the secondary factors indicate the '606 patent is nonobvious.

### E.    The '606 patent is obvious

Based on the above analysis, the Court concludes: (1) there is no particular enhanced skill in the art necessary to design a nipple cover, (2) the scope and content of the prior art is exceedingly broad, (3) there is little difference, if any, between the claimed invention and the prior art, and (4) the secondary factors do not provide any significant indicia of nonobviousness.  However, individual analysis of the factors does not end the inquiry.  In order to prove a patented invention is invalid as obvious, Defendants need to identify prior art references "which alone or combined with other references would have rendered the invention obvious to one of ordinary skill in the art at the time of invention."  *Al-Site Corp.*, 174 F.3d at 1323.  The Court finds Defendants have satisfied their burden.

On perhaps the most crucial of the *Graham* factors, the differences between the claimed invention and the prior art, Defendants presented a bevy of prior art references which disclose the features of the '606 patent.  Though the Court discussed a number of prior art patents above, a combination of four patents disclose every aspect of the '606 claim language: Nakai, Woodley, Hattori (I), and Hattori (II).  The majority of the '606 claims can be found in more than one of these references, and there is not a single aspect of the '606 claims that is found in only one prior art reference.  While the Court is cognizant of the Supreme Court's caution in *KSR In'tl* that "a patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art," the Supreme Court also emphasized in the

same opinion that common sense and flexibility should steer any obviousness inquiry.  Under such an approach, the '606 patent is obvious.

The one arguable difference in claim language between the prior art that was before the examiner and the '606 patent is the limitation that the nipple cover must cover more than half but less than all of the breast.  The Court already found in its analysis that this limitation was disclosed in the Hattori (II) patent (which was not before the examiner), and is therefore not novel to the '606 patent.  However, even were this limitation not disclosed in Hattori (II), breast pads and nipple covers in the prior art patents ranged in size from covering solely the nipple to covering the entire breast.  Certain patents even emphasized the need for breast pads that would expand or contract during the wearing to continually ensure a certain coverage of the breast.  *E.g.*, U.S. Patent No. 5,843,062 col. 1:26-54.  Based on the vast sizing differences found through prior art nipple covers and breast pads, the idea of covering more than half but less than all of the breast would have been an obvious step for one of ordinary skill in the art to take in order to accomplish the need for discreet nipple coverage while maintaining a natural breast appearance.  In other words, it was a step that combined familiar elements of multiple patents according to known methods.

Plaintiff's arguments are unpersuasive.  Plaintiff argues Defendants presented no motivation to combine these patents to arrive at the claimed invention.[9]  However, the majority of the '606 patent's claims can be found in the two Hattori patents, both of which were patented by the same inventor.  Moreover, the Woodley patent references Hattori (I) and Nakai on its face as prior art patents.  Given the patents reference each other and deal with remarkably similar subject matter,

---

[9] In *KSR Int'l*, the Supreme Court did away with the rigid application of the Teaching-Suggestion-Motivation test formerly employed by the Federal Circuit.  However, the *KSR Int'l* court also noted the necessity of showing some rational underpinning for combining prior art references at the time of invention.

there is a strong motivation to combine the teachings of the patents and arrive at the '606 patent.

Plaintiff's expert also concludes the various prior art references either do not disclose or teach away from the '606 patent's teachings.  For example, the expert argues Hattori (II) teaches away from the patented claims because it teaches a uniform thickness of the cover, and also because it would leave lumps at the periphery by using velcro and adhesives to attach the cover.  The expert also argues Woodley and the Hattori patents teach away because they would only cover the nipple, areola, and short region around the areola, or the entire breast.  Generally, a reference is said to teach away when a person of ordinary skill in the art, upon reading the reference, would be discouraged from the path set out in the prior art or led in a direction divergent from the path taken by the applicant.  *Fisher-Barton Blades, Inc. v. Blount, Inc.*, 2008 WL 906125, at *11 (E.D. Wis. 2008). There is nothing in the prior art references that would discourage the approach Plaintiff offers in the '606 patent, and hence it is difficult to grasp how these references would "teach away" from the '606 patent's solution.  While Plaintiff argued extensively that the sizing aspect of the '606 patent is novel because it provides more security for the wearer by covering more of the breast, and that the various prior art patents teach away from increasing the size of the cover, a review of the prior art reveals number of patents teaching various sized nipple coverings.  Some of those same patents also emphasize security as the idea behind the increase size in the covering.  For example, Hattori (II) discloses a nipple cover that covers "substantially all" of the breast, and the entire thrust of the Hattori (II) patent is a means for securing the covering to ensure it stays in place at all times. '550 patent col. 12:34-36; '550 patent col. 3:15-20 ("A fifth object of the invention is to provide a privates covering designed to cover the privates without being moved relative to the latter, even if a garment worn thereover...is moved relative to the wearer's body").  The emphasis on the covering remaining

in place underlies a concern for a woman's sense of privacy, and security in that privacy.  Nothing about the Hattori (II) patent teaches away from increasing the nipple cover's size.  To the contrary, the patent teaches exactly what the '606 patent teaches.  Much the same can be said for all the other differences Plaintiff argues "teach away"–the cited differences are minute differences, and when the prior art patents are read together in their entirety, they teach everything in the '606 patent.

As the Supreme Court noted, "granting patent protection to advances that would occur in the ordinary course without real innovation retards progress and may, in the case of patents combining previously known elements, deprive prior inventions of their value of utility."  *KSR Int'l Co.*, 127 S. Ct. at 1741.  Such is the case here.  Plaintiff combined familiar elements according to known methods, and achieved a predictable result by doing so.  Under the *KSR Int'l* approach, her patent is therefore obvious.[10]  *KSR Int'l Co.*, 127 S. Ct. at 1741.  Based on the analysis undertaken herein, the Court finds U.S. Patent No. 7,152,606 fails to meet the criteria for patentability set forth in 35 U.S.C. § 103(a), and the '606 patent is hereby found invalid.

## CONCLUSION

For the reasons discussed herein,  Defendants' Motion for Summary Judgment For Non-Infringement (Doc. No. 135) and Invalidity is **GRANTED IN PART** and **DENIED IN PART AS MOOT**.

---

[10]

As the Supreme Court noted in *KSR Int'l*, a combination of certain known elements is likely nonobvious if the elements work together "in an unexpected and fruitful manner."  *KSR Int'l Co.*, 127 S. Ct. at 1740.  In contrast, a patent is likely obvious if it merely yields a predictable result by substituting one element for another known element in the field.  *Id.*

**So ORDERED and SIGNED this 15th day of August, 2008.**

JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE